UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



GLOBECON GROUP, LLC,

          Plaintiff,

-against-

INTUITION PUBLISHING, INC. and
PATRICK PANCOAST,

          Defendants.

**COMPLAINT AND JURY DEMAND**

Case No.: **07 CIV. 2817**
ECF CASE

**JUDGE MARRERO**

The plaintiff, GLOBECON GROUP, LLC, by its attorney, Eric J. Rotbard, Esq. as and for their Complaint against the defendants, allege as follows:

### PRELIMINARY STATEMENT

1.    This is an action for pecuniary and injunctive relief from copyright infringement arising under the Copyright Laws of the United States, Title 17 of the United States Code, together with pendent New York State claims for misappropriation of plaintiff's proprietary intellectual property and trade secrets, breach of contract, tortuous interference in contractual relations; theft and illegal disclosure of proprietary trade secrets, unfair competition and accounting.

2.    The plaintiff alleges that the defendants misappropriated and infringed its valid copyright in many thousands of pages of proprietary materials developed exclusively by plaintiff over more than two decades.

3.    The above-mentioned copyright includes, among other things, print, digital, interactive multimedia and audio-video content focused in capital markets topics such as cash market instruments, options, forwards, futures, swaps and derivatives; corporate finance topics such as cost of capital, corporate valuation, capital structure,

1

financial forecasting and modeling, mergers & acquisitions, leveraged buy-outs, restructurings, and asset securitization; credit and treasury subjects such as financial statement analysis, credit analysis and underwriting, cash management and treasury services; and, risk management topics such as hedging, wealth management topics such as asset liability management, portfolio management and risk management. These are among the many hundreds of specialized subjects covered by plaintiff's proprietary content.

4.    These above-described proprietary materials comprising basic, intermediate and advanced content for professionals working in the banking, financial services and insurance sectors globally have been used by plaintiff for more than 25 years in the business of its conferences, seminars and workshops; its print publication and newsletters; its online distance education business; and, its various professional development consulting services.

5.    Upon information and belief, the content was misappropriated and illegally used by defendants as-if-their-own to radically overhaul defendants' products and services to mimic those of plaintiff, to generate millions of dollars of ill-gotten revenues from stolen materials, to infringe upon the trademark identify of plaintiff and to undermine plaintiff's relationships with clients. The content constitutes the very core of plaintiff's business and valuable globally recognized brand serving banking, financial services and insurance companies.  By use of stolen materials, defendants have caused incalculable losses of revenue and clients, and other actual and/or statutory damages. Plaintiff's copyright notices are clearly posted, and as needed filed with the United States Copyright Office.

## *JURISDICTION*

6.    The plaintiff is a limited liability company duly organized and existing pursuant to the laws of the State of Delaware, is authorized to do business as a foreign company in the State of New York and maintains a principal place of business at 1 West Street, Suite 100, At 17 Battery Place, City and State of New York 10004.

7.    Plaintiff is in the business of serving the banking, financial services and insurance sectors by providing its conferences, seminars and workshops; its print publication and newsletters; its online distance education business; and, its various professional development consulting services.

8.    Upon information and belief, the defendant INTUITION PUBLISHING, INC. (hereinafter "Intuition") is a domestic corporation, duly organized and existing pursuant to the laws of the State of New York, and has a principal place of business at 245 5th Avenue, Suite 2204, City and State of New York 10016.

9.    Upon information and belief, Intuition is in the business of serving the banking, financial services and insurance sectors (among other businesses) by providing online distance education and its workshops, as well as various professional development consulting services. This portion of defendant Intuition's business directly competes with plaintiff.

10.    Defendant PATRICK PANCOAST (hereinafter "Pancoast") is a natural person, and, upon information and belief, currently resides at 50 Traps Lane, New Malden, Surry KT3 4SA, United Kingdom. Pancoast is a natively born United States citizen who, upon information and belief, is regularly in the City, County and State of New York to solicit and conduct business on his own behalf, on behalf of his wholly

owned company "Market Abilities Unlimited, Inc." and on behalf of defendant Intuition as either an employee or full-time consultant.

11.    This Court has jurisdiction over the subject matter of this action as provided for in 28 U.S.C. §§ 1331 and 1338(a) and (b).

12.    This Court has jurisdiction over defendants in that defendant Intuition was incorporated in the State of New York and maintains its principal place of business in this District, and that, upon information and belief, defendant Pancoast is an agent, servant or employee of defendant Intuition, and because defendants committed acts of misappropriation of plaintiff's proprietary intellectual property and trade secrets, breach of contract, tortuous interference in contractual relations; theft and illegal disclosure of proprietary trade secrets, unfair competition and accounting of damages during the course of their business in this District.

13.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2) and (3) and 1400, as plaintiff's claims arose in this District, and/or the defendants may be found in this District.

## *FACTS*

14.    At all times relevant hereto, plaintiff was and still is engaged in the banking, financial services and insurance sector business of providing, among other things, conferences, seminars and workshops; including print publication and newsletters, online distance education and various professional development consulting services.

15.    In January 2002, Plaintiff acquired the assets of a company now known as XGGL, Inc. ("XGGL," or "Old Globecon"), including the XGGL proprietary content and contractual rights with regard to Old Globecon's former employees and consultants.

16.    At all times relevant hereto, defendants Intuition and Pancoast have been and still are engaged in a nearly identical business to plaintiff; and as such, have been and still are direct competitors of plaintiff.

17.    Pancoast was an employee to plaintiff and Old Globecon for approximately 7 years beginning from on or about January 20, 1987, until sometime during 1994.

18.    During this time, Pancoast reported on his resume submitted to plaintiff that he "managed a seminar business employing eight teaching consultants representing $5 million of revenues each year."

19.    Upon leaving Old Globecon in 1995 and through the year 2000, Pancoast formed and operated Market Abilities Unlimited, Inc., where he purportedly to "taught over 100 days of seminars each year and managed [a] four-person company."

20.    During a near identical period of time, 1995 through 1999, Pancoast allegedly was "Director of Product Education" at Barclays Capital Group. No where on Pancoast's resume is listed or identified any intellectual property he created or published while at his own company or Barclays Capital Group, nor did he at that time report to plaintiff the creation and ownership of such property.

21.    Upon information and belief, sometime following February 2000, Pancoast acted as a consultant, advisor or employee of Cygnifi Derivative Services LLC in the role of "Sales Director, Europe" until October 2001.

22.    From February 15, 2002, until on or about April 10, 2003, Pancoast was a full-time employee of plaintiff.

23.    Thereafter, upon information and belief, Intuition immediately hired Pancoast as either a full-time employee or consultant in the role of "Chief Learning Officer," where he remains employed to date.

24.    The professional training and education industry is a highly competitive field, and plaintiff's success in that industry is substantially dependent upon the quality of course and training materials, the strength of its client relationships, proprietary sales databases, industry reputation, access to capable instructors and ability to obtain repeat business from new and existing clients. Defendants' alleged actions described herein, directly and significantly damaged plaintiff's business, causing the diversion of many millions of dollars of business and the potential for continuing irreparable damage if their actions do not cease.

25.    In connection with plaintiff's business activities, plaintiff employs key staff members each of whom is assigned a particular sphere of work, including management of content development, instructional delivery, client engagements, instructor services and client sales, among other things. Each key employee is engaged by plaintiff pursuant to a written employment agreement and a confidentiality, intellectual property, non-circumvent and non-compete agreement. Upon signing such agreements, each key employee agrees explicitly and implicitly to conduct themselves according to the highest business standards, to acts as trusted members of plaintiff's team to ensure the highest standards of ethical conduct, to protect plaintiff's proprietary

content from conversion or theft, and to deliver the highest quality of program delivery and service to plaintiff's clients.

26.    Defendant Pancoast was a key employee of plaintiff's, he read, agreed to and signed plaintiff's standard Confidentiality, Intellectual Property and Non-Circumvention Agreement (the "CIPNCA") to permit him access to sensitive and confidential plaintiff proprietary materials, client lists and contacts, sales databases, instructors, and other confidential information. The CIPNCA is referenced specifically in Pancoast's employment agreement with the plaintiff, which Pancoast separately signed (described later herein). Among the key components of the CIPNCA Pancoast signed are confidentiality, non-disclosure clauses, as well as restrictive covenants not to compete with the plaintiff for a short and reasonable period of time following such employment. Confidential information is clearly defined in the CIPNCA:

> Confidential information or material of Globecon or its subsidiaries is any information or material: (a) generated or collected by or utilized in the operations of Globecon or its subsidiaries, (b) received from any third party, or (c) suggested by or resulting from any task assigned to me or work performed by me for or on behalf of Globecon or its subsidiaries, and which has not been made available generally to the public, whether or not expressed in a document or other medium and whether or not marked "Globecon Confidential" or with any similar legend of Globecon or any third party. Confidential information includes any non-public information disclosed to me either directly or indirectly, in writing, through electronic media, orally, or visually, in connection with any discussions and/or transactions regarding Globecon. Confidential information includes any and all software, source code, systems documentation, application design and specification documentation and related materials directly or indirectly associated with Globecon's e-learning application known as Fintranet, and any supporting operational databases, interfaces and components.

27.    Plaintiff's ability to obtain new and repeat business from clients is dependent upon the protection of this proprietary and confidential information. Such

information has been treated at all times as confidential by plaintiff and Old Globecon and constitutes its trade secrets.

28.    The information, procedures and methods constituting plaintiff's development and use of its confidential information are not ascertainable by those outside plaintiff's organization, have always been treated as proprietary and confidential by plaintiff, and constitute proprietary information and trade secrets.

29.    Employees who breach the CIPNCA while employed by plaintiff or thereafter and provide competitors or new employers with this information have a very distinct competitive advantage because the information, upon information and belief, is widely recognized for its superior quality, depth and breadth, as well as the enormous volume of materials. The proprietary content of plaintiff represents many millions of dollars of investment by a collective effort by plaintiff's staff over many years. In creation of this confidential and proprietary content, plaintiff developed and maintains a variety of proprietary standards, guidelines, processes and standards that, along with the content, are not generally known and/or readily available to others who might benefit from access to the information.

30.    The aforementioned trade secrets and confidential information represents vital keys to the future business success of plaintiff.

31.    Among other aspects of the confidential information, key employees of plaintiff have direct access to senior executives of plaintiff's clients, as well as to its instructors, presenters and facilitators.

32.    Because of the sensitive nature of these relationships between plaintiff, its customers and its instructors, key managers or professional and technical employees

8

who sign the CIPNCA are bound by a clear an unambiguous restrictive covenant

("Restrictive Covenant") which in part states:

> Throughout the term of my employment with Globecon and for a year thereafter and regardless of the reason of my departure and/or termination, that without Globecon's prior written I shall not, directly or indirectly:

> a. Solicit or be or become associated with or the direct or indirect economic or financial beneficiary of any entity "in any capacity [Footnote 1]" which solicits, specifically and narrowly, any Globecon's "customers" and/or "sales prospects [Footnote 2]" AND is a "direct competitor to Globecon [Footnote 3]."

> b. Aid or agree to aid any partner, shareholder, owner, officer, advisor, consultant, director, employee, principal, agent, creditor, trustee, co-venturer or other party related to of Globecon to leave its employ or aid or agree to aid any competitor, customer or supplier in any attempt to hire any person who was associated with Globecon during my employment and during the twenty four (24) months immediately preceding this agreement.

> [Footnote 1 above states: "The term 'in any capacity' includes, without limitation, as a partner, shareholder, owner, officer, advisor, consultant, director, employee, principal, agent, creditor, trustee, co-venturer or otherwise."]

> [Footnote 2 above states: "The term 'customers' applies specifically to clients of Globecon during my employment, or those customers have been clients of Globecon during the twenty four (24) months immediately preceding this agreement; and, the term 'sales prospects' applies specifically to individuals and/or entities which have received proposals from Globecon and/or are on one or more sales prospect lists of Globecon during my employment or during the twenty four (24) months immediately preceding this agreement."]

> [Footnote 3 above states: "A "direct competitor to Globecon" is any person, partnership, corporation, company or other entity which provides education, professional development; workshop; seminar; online distance learning; interactive educational services; and/or financial service and finance-

related instructional design and/or consulting or advisory services or products."]

33.     The CIPNCA and its Restrictive Covenant guard against the release of inside, unique and proprietary information and unfair competition as such employees are in a position to damage plaintiff in tangible or significant ways once their employment with plaintiff terminates.

**The Agreements**

34.     Defendant Pancoast was employed by Old Globecon as an executive with increasing levels of responsibility from on or about January 20, 1987, until sometime during 1994.

35.     From 1995 through 2001, upon information and belief, Pancoast did business as "Market Abilities Unlimited, Inc." and also acted as a consultant, advisor or employee of Cygnifi Derivative Services LLC at sometime following February 2000 up until October 2001, shortly before his employment by plaintiff.

36.     Defendant Pancoast was employed by plaintiff Globecon as a Managing Director, from on or about February 15, 2002, until on or about April 10, 2003.  A copy of his jointly signed employment agreement dated as of February 15, 2002 is annexed hereto as Exhibit "A" (the "Employment Agreement"). A copy his jointly signed CIPNCA dated as of February 15, 2002 is annexed hereto as Exhibit "B" (the "CIPNCA").

37.     Along with many dozens of his colleagues who were subject matter experts, Pancoast was involved in developing content for plaintiff's self-instructional guides, workshops, cases and spreadsheets, among other types of content, and delivering

10

workshops. Authorship of plaintiff's content always has resided with plaintiff and not with any third party, including Pancoast. No third-party licensing agreements were <u>ever</u> entered into for license of Globecon content to non-clients.

38.    During his long affiliation with plaintiff and Old Globecon, defendant Pancoast had extensive access to plaintiff's sensitive and confidential plaintiff client lists, client contacts, sales databases, instructors, content and other confidential and/or proprietary information relating to the business of plaintiff.

39.    Upon information and belief, defendant Intuition hired defendant Pancoast following his termination of employment with plaintiff, in or about September 2003.

40.    Upon learning that Pancoast was hired by Intuition, Plaintiff immediately sent both defendants a cease and desist notice, informing them they were in breach of the Employment Agreement, CIPNCA and the Restrictive Covenant, detailing each breach to defendants and reserving rights as against each.

41.    Several months later, in or about December 2003, plaintiff was informed in London that defendant Pancoast was invited at the last minute to bid for business already promised to plaintiff by a long-time client. That last minute invitation caused a 6-month delay in closing of the contract between the client and plaintiff. During that 6-month delay, in early 2004, plaintiff was informed by various client contacts that defendant Intuition had recently "acquired a vast amount of advanced finance content," had been successful at greatly improving the sophistication of its materials "with remarkable speed" for both workshops and online distance education and that defendant Pancoast had become Intuition's Chief Learning Officer. Plaintiff's client informed it

that the reason for the delay was it was surprised at the high quality of defendant's "recently acquired" content, and had required time for additional consideration.

42.    During the summer and fall of 2004, plaintiff learned from former employees of Old Globecon that defendant Intuition's "content acquisition" had in fact been reckless and brazen misappropriation of defendant's proprietary intellectual property by defendants. These individuals highlighted for plaintiff a vast array of plaintiff's own proprietary content which had been misappropriated by defendant Pancoast through "copy and paste" into Pancoast's letterhead stationary as "Market Abilities Unlimited."

43.    In and around the same time, plaintiff held meetings with one or more independent instructors in Germany and first learned that Pancoast had for some period of time been marketing "a vast library of high end finance content" purported to be his own. Upon information and belief, such content was misappropriated from plaintiff by Pancoast.

44.    By early 2005, plaintiff's strong factual information regarding the theft of its intellectual property by Pancoast was further confirmed when the founder and CEO of XGGL informed plaintiff by affidavit, as follows:

> Pancoast ran our European operation until 1995 and then established his own business. I state affirmatively that his authority to use materials of Old Globecon were limited to use in the ordinary course of business in instruction, and not to sale or any other disposition. Those rights to use the materials terminated in 1995 with his departure from Old Globecon, other than his rights to use said material as an instructor on behalf of Old Globecon, in the normal course of business and under the Globecon brand and copyright with Globecon's direct clients for the period commencing in or around 1999 and ending on or before the sale of Old Globecon assets to New Globecon.

No valid enforceable agreements existed whereby Old Globecon directly assigned, sold or transferred license rights to any former employee, contractor or agent of any intellectual property of Globecon, including Pancoast, regardless of whether that intellectual property was developed by a full-time or part-time employee, agent or independent contractor. Further, no valid enforceable agreements existed whereby any of the Old Globecon's intellectual property was co-ventured, co-owned or otherwise co-held by Old Globecon and any third party.

45.     In late 2006, plaintiff was provided samples of defendant Intuition's online distance education courses. Such samples confirmed, again, intellectual property theft and misappropriation by defendants Intuition and Pancoast.

46.     At no time was Pancoast or any other consultant or employee granted any right, title or interest to plaintiff's proprietary materials. In fact, all employees and consultants employed at Old Globecon and plaintiff have been engaged consistently on a 'work-for-hire' basis.

47.     Pursuant to the CIPNCA, defendant Pancoast agreed to the following, among other things:

[He] will not, without Globecon's prior written permission, disclose to anyone outside of Globecon and its subsidiaries or use in other than Globecon's and its subsidiaries' business, either during or after [his] employment, any confidential information or material of Globecon or its subsidiaries, or any information or material received in confidence from third parties such as suppliers or customers, by Globecon or its subsidiaries. If [he] leave[s] the employ of Globecon, [he] will return to Globecon all property in [his] possession, whether or not containing confidential information, including but not limited to diskettes and other storage media, drawings, notebooks, reports, and other documents belonging to Globecon or its subsidiaries or received from any third party by Globecon or any of its subsidiaries.

48.     Defendant Pancoast also agreed to the following clause within the Restrictive Covenant:

a)   If I breach any of the restrictive covenants set forth in this Attachment A (the "Restrictive Covenants"), Globecon shall have the following rights and remedies, each of which shall be independent of the others and severally enforceable, and each of which is in addition to, and not in lieu of, any other rights and remedies available to Globecon at law or in equity:

   i.   I shall be immediately required to disclose, account for and pay over to Globecon all actual compensation, profits, monies, and accruals derived or received by me as a result of any action or transactions constituting a breach of any of the Restrictive Covenants. If Globecon, in its sole and absolute discretion, is not satisfied as to the timeliness and/or accuracy of the disclosure, accounting and/or payment made to it, Globecon will notify me in writing and shall have the unfettered right to notify any and all entities to which I become associated of the terms of this agreement, and I hereby do grant to Globecon the right to direct those entity(ies) to disclose directly to Globecon the information it needs to determine all actual compensation, profits, monies, and accruals derived or received by me as a result of any action or transactions constituting a breach of any of the Restrictive Covenants.

   ii.  Notwithstanding the provisions of Attachment A hereof, I acknowledge and agree that in the event of a violation or threatened violation of any of the Restrictive Covenants, Globecon shall have no adequate remedy at law and shall therefore be entitled to enforce each provision by temporary or permanent injunctive or mandatory relief obtained in any court of competent jurisdiction without the necessity of proving damages, posting any bond or other security, and without prejudice to any other rights and remedies which may be available at law or in equity.

   iii. If any of the Restrictive Covenants, or any part thereof, is held to be invalid or unenforceable, the same shall not affect the remainder of the covenant or covenants, which shall be given full force and effect, without regard to the invalid or unenforceable portions.

   iv.  If any of the Restrictive Covenants, or any part thereof, is held to be unenforceable because of the duration of such provision or the area covered thereby, the parties hereto agree that the court making such determination shall have the power to reduce the duration and/or area of such provision and, in its reduced form, such provision shall then be enforceable.

49.    Importantly, the contractual rights under the Restrictive Covenant granted to plaintiff, as cited above, include the "unfettered right to notify any and all entities to which [Pancoast] become[s] associated of the terms of [the Restrictive Covenant], and [defendant Pancoast] hereby do grant to [plaintiff] Globecon the right to direct those entity(ies) to disclose directly to [plaintiff] Globecon the information it needs to determine all actual compensation, profits, monies, and accruals derived or received by [defendants Intuition and Pancoast] as a result of any action or transactions constituting a breach of any of the Restrictive Covenants."

50.    Additionally, the Restrictive Covenant, confirms "in the event of a violation or threatened violation of any of the Restrictive Covenants, Globecon shall have no adequate remedy at law and shall therefore be entitled to enforce each provision by temporary or permanent injunctive or mandatory relief obtained in any court of competent jurisdiction without the necessity of proving damages, posting any bond or other security, and without prejudice to any other rights and remedies which may be available at law or in equity."

51.    Defendant Pancoast voluntarily terminated his employment with plaintiff on or about April 10, 2003. Immediately, or shortly thereafter, defendants Intuition and Pancoast conspired to breach and did breach the Employment Agreement and CIPNCA, as well as to subvert the copyright laws of the United States.

52.    During the fall of 2006, plaintiff learned that defendants Intuition and Pancoast had successfully sold services and licensed content defendants purport to be its own to several key clients of plaintiff. It was further informed that a key issue was that "amazingly high quality" of the content defendants' alleged to own. From one client

15

alone, plaintiff lost a $350,000 annual contract to defendants. Defendants' theft of plaintiff's intellectual property and unfair competitive practices has and continues to cost plaintiff many millions of dollars in lost revenues annually.

**The Content**

53.    Upon information and belief, defendant Pancoast maintained a copy of plaintiff's proprietary databases on computers he owned and used for distribution in print, online education, workshops and other forms. These proprietary databases contain many thousands of pages of plaintiff's content. Upon his termination from employment with plaintiff Pancoast failed to comply with the CIPNCA. He did not "return to [plaintiff] all property in [his] possession, whether or not containing confidential information, including but not limited to diskettes and other storage media, drawings, notebooks, reports, and other documents belonging to [plaintiff] or its subsidiaries or received from any third party by [plaintiff] or any of its subsidiaries," as provided for in the CIPNCA.

54.    Upon information and belief, defendants Intuition and Pancoast conspired to breach and did breach the Employment Agreement and CIPNCA. Intuition immediately hired Pancoast as either a full-time employee or consultant in the role of "Chief Learning Officer" notwithstanding the fact Intuition knew, should have known, or should have inquired as is custom and practice in the industry, whether, as a former senior executive employed by plaintiff, Pancoast had entered into an employment agreement with plaintiff, and whether that agreement contained any restrictive covenants.

55.     Upon or very shortly after his termination of employment with plaintiff, defendants Intuition and Pancoast conspired to subvert the copyright laws of the United States. Intuition hired Pancoast as either a full-time employee or consultant because, in fact, Pancoast had access to plaintiff's proprietary materials and proprietary databases.

56.     Upon information and belief, prior to, contemporaneously with, or very shortly after his termination of employment with plaintiff, defendant Pancoast presented plaintiff's content to third parties, including defendant Intuition, claiming and holding same out to the world to be Pancoast's copyrighted works.

57.     Annexed hereto as Exhibit "C" is a sample of plaintiff's copyright proprietary content entitled "Bond Futures" prepared in or around 1994; annexed hereto as Exhibit "D" is material now presented by defendant Pancoast as his own, entitled "Bond Futures". Defendant Pancoast's Exhibit "D", pp. 25 *et seq.* is virtually a verbatim copy of plaintiff's Exhibit "C", pp. 4 *et seq.* except for updated tables.

58.     Annexed hereto as Exhibit "E" is a sample of plaintiff's copyright proprietary content entitled "Relative Value Concepts", prepared in or around 1995; annexed hereto as Exhibit "F" is material now presented by defendant Pancoast as his own, entitled "Relative Value Trading Strategies". Defendant Pancoast's Exhibit "F", pp. 2 *et seq.* is virtually a verbatim copy of plaintiff's Exhibit "E", pp. 3 *et seq.* except for updated tables.

59.     Annexed hereto as Exhibit "G" is a sample of plaintiff's copyright proprietary content entitled "Option Book Management", prepared in or around 1995; annexed hereto as Exhibit "H" is material now presented by defendant Pancoast as his

own, entitled "Managing Interest Rate Option Risk".  Defendant Pancoast's Exhibit "H", pp. 2 *et seq.* is virtually a verbatim copy of plaintiff's Exhibit "G", pp. 19 *et seq.*

60.    Annexed hereto as Exhibit "I" is a sample of plaintiff's copyright proprietary content entitled "LIBOR-in-Arrears Swaps", prepared in or around 1994; annexed hereto as Exhibit "J" is material now presented by defendant Pancoast as his own, entitled "Libor/Euribor-in-Arrears".  Defendant Pancoast's Exhibit "J", pp. 1 *et seq.* is virtually a verbatim copy of plaintiff's Exhibit "I", pp. 2 *et seq.* except for updated tables and examples.

61.    Plaintiff has possession of many such examples of misappropriation and theft of its proprietary intellectual property, and is aware, upon information and belief that a very significant number other such examples of misappropriation exist.

62.    Upon information and belief, in or about December 2002, defendant Intuition and plaintiff met (along with Pancoast, then an employee of plaintiff) in New York to discuss the possibility of collaboration, joint venture and/or merger. Documents written at the time of that meeting confirm that Intuition expressed clear need to acquire the significantly higher quality content owned by Plaintiff and to use plaintiff's reputation, skills, client relationships and workshop content to enter the workshop business in the banking and financial services sectors.

63.    No such collaboration, joint venture and/or merger was ever consummated.

64.    Shortly thereafter on or about April 10, 2003, defendant Pancoast resigned from plaintiff and with defendant Intuition conspired to breach and did breach the Employment Agreement, the CIPNCA and the Restrictive Covenant, as well as to

misappropriate plaintiff's content and subvert the copyright laws of the United States. In or about the summer of 2004, Plaintiff would first learn that the misappropriation of its content occurred.

65.    Upon information and belief, at some time following the December 2002 meeting of the parties, defendant Pancoast advised defendant Intuition that he could provide substantial content to defendant Intuition that would enable Intuition to more effectively compete with plaintiff. Defendant Pancoast had expressed significant upset and disappointment that a collaboration, joint venture and/or merger was never made between Intuition and Globecon.

66.    Upon information and belief, defendant Intuition knew or should have known that Pancoast intended to provide it with the proprietary content copied from the plaintiff. Upon information and believe, Intuition willfully interfered with plaintiff's contractual relationship with Pancoast because it believed that plaintiff would not learn of the theft and misappropriation of the intellectual property and its proprietary databases.

67.    Upon information and belief, defendant Intuition hired defendant Pancoast as an employee or retained Pancoast as a consultant for the purposes of converting and misappropriating plaintiff's content and customer lists.

68.    Upon information and belief, defendant Intuition is using intellectual property content copied from the plaintiff by defendant Pancoast in connection with its distance education system and newly formed workshop business within the banking, financial services and insurance sectors.

69.    Upon information and belief, defendants Pancoast and/or Intuition thereafter presented copies of plaintiff's content to third parties and utilized same in connection with their distance education system and newly formed workshop business, claiming plaintiff's content to be their own.

70.    Upon information and belief, defendant Pancoast disclosed to defendant Intuition plaintiff's clients and sales databases, the names and contact information of plaintiff's clients, the names and contact information of plaintiff's instructors and other confidential and/or proprietary information belonging to plaintiff.

71.    Upon information and belief, defendants Pancoast and Intuition are soliciting and obtaining the benefits of business from plaintiff's clients.

72.    Plaintiff Globecon has been advised by one or more of its clients and instructors that defendant Pancoast, on behalf of defendant Intuition sought and solicited and continues to seek and solicit the business of Globecon's clients for and on behalf of himself and defendant Intuition, and defendants Pancoast and Intuition have accepted and are accepting business from Globecon's clients.

73.    Upon information and belief, defendant Pancoast provided defendant Intuition with other proprietary, copyrighted and/or confidential material related to plaintiff's training and educational programs.

74.    Defendant Pancoast further refused and continues to refuse to return proprietary databases, and used those databases and contact information to solicit business in direct contravention of the CIPNCA.

75.    Upon information and belief, defendant Intuition accepted such confidential and/or copyrighted information and materials from defendant Pancoast, and

knew or should have known that such material was the confidential and proprietary information belonging to plaintiff Globecon.

## FIRST CLAIM FOR RELIEF

76.    Plaintiff, in the course of its business, authored certain intellectual property, including educational and business materials utilized and to be utilized in its conferences, seminars, workshops online distance education business and other professional development services within the banking and financial services sectors.

77.    Plaintiff is the sole proprietor of all rights, title, and interest in and to the above-described intellectual property. All of its content had and continues to bear appropriate copyright and intellectual property notices at all times relevant hereto.

78.    Certain of the above-described intellectual property as set forth in Exhibit "M" annexed hereto was duly registered with the United States Copyright Office on the dates referenced in said Exhibit.    Plaintiff complied in all respects with the Title 17 (Copyrights), Chapter 4 of the United States Code, all rules, codes and regulations promulgated thereunder, and all other laws governing copyright, and secured the exclusive rights and privileges in and to the copyright of said material identified in the annexed Exhibit "M", and received from the Register of Copyrights certificates of registration, dated and identified as indicated in the annexed Exhibit "M".

79.    Upon information and belief, following defendant Pancoast's termination of employment with plaintiff in or about April, 2003 and his hiring by defendant Intuition, defendants Pancoast and/or Intuition, upon information and belief, began reproducing, adapting, distributing, and utilizing plaintiff's copyrighted intellectual property, including, upon information and belief, the duly registered materials set forth in

the annexed Exhibit "M" in connection with its online distance education business, workshops and other professional development services within the banking, financial services and insurance sectors, in direct competition with plaintiff.

80.    Annexed hereto as Exhibit "C" is a sample of plaintiff's copyright proprietary content entitled "Bond Futures" prepared in or around 1994; annexed hereto as Exhibit "D" is material now presented by defendant Pancoast as his own, entitled "Bond Futures". Defendant Pancoast's Exhibit "D", pp. 25 *et seq.* is virtually a verbatim copy of plaintiff's Exhibit "C", pp. 4 *et seq.* except for updated tables.

81.    Annexed hereto as Exhibit "E" is a sample of plaintiff's copyright proprietary content entitled "Relative Value Concepts", prepared in or around 1995; annexed hereto as Exhibit "F" is material now presented by defendant Pancoast as his own, entitled "Relative Value Trading Strategies". Defendant Pancoast's Exhibit "F", pp. 2 *et seq.* is virtually a verbatim copy of plaintiff's Exhibit "E", pp. 3 *et seq.* except for updated tables.

82.    Annexed hereto as Exhibit "G" is a sample of plaintiff's copyright proprietary content entitled "Option Book Management", prepared in or around 1995; annexed hereto as Exhibit "H" is material now presented by defendant Pancoast as his own, entitled "Managing Interest Rate Option Risk". Defendant Pancoast's Exhibit "H", pp. 2 *et seq.* is virtually a verbatim copy of plaintiff's Exhibit "G", pp. 19 *et seq.*

83.    Annexed hereto as Exhibit "I" is a sample of plaintiff's copyright proprietary content entitled "LIBOR-in-Arrears Swaps", prepared in or around 1994; annexed hereto as Exhibit "J" is material now presented by defendant Pancoast as his own, entitled "Libor/Euribor-in-Arrears". Defendant Pancoast's Exhibit "J", pp. 1 *et seq.*

is virtually a verbatim copy of plaintiff's Exhibit "I", pp. 2 *et seq.* except for updated tables and examples.

84.     The materials provided for in Exhibit "C", "E", "G", and "I" represent only a fraction of plaintiff's proprietary material that defendants have infringed and misappropriated.

85.     Annexed hereto as Exhibit "K" is a sample of plaintiff's online course titles which were in existence since 2002; and, annexed hereto as Exhibit "L" is sample that defendant Intuition's course titles that it lists on its web sites.  The addition of Intuition courses of near or identical titles to Globecon courses correspond directly to employment of defendant Pancoast by defendant Intuition; the breach of the Employment Agreement, CIPCNA and Restrictive Covenant by Pancoast; the tortuous interference by Intuition with plaintiff's contractual relationship with Pancoast; and the misappropriation of plaintiff's intellectual property by defendants. Upon information and belief, defendant Intuition's courses utilize proprietary information belonging to plaintiff.

86.     Unless enjoined and restrained, defendants' conduct threatens to further infringe plaintiff's copyright interests.

87.     At no time has plaintiff authorized defendants to reproduce, adapt, distribute or in any way utilize the said copyrighted material.

88.     Plaintiff has notified defendants that defendants have infringed the copyrights of plaintiff, and defendants have continued to infringe the copyrights.

89.     By reason of defendants' infringement and threatened infringement, plaintiff has sustained and will continue to sustain substantial injury, loss and damage to its ownership rights in the copyrighted works.

90.    Further irreparable harm to plaintiff is imminent as a result of defendants' conduct, and plaintiff is without an adequate remedy at law. Plaintiff is therefore entitled to an injunction restraining defendants Pancoast and Intuition, together with its officers, directors, agents, employees, representatives and all persons acting in concert with them from engaging in further such acts of copyright infringement.

91.    Plaintiff is further entitled to recover from defendants the damages sustained by plaintiff as a result of defendants' acts of copyright infringement. Plaintiff is at present unable to ascertain the full extent of the monetary damage plaintiff has suffered by reason of defendant's acts of copyright infringement, but plaintiff is informed and believes, and on the basis of such information and belief alleges, that plaintiff has sustained such damage in an amount exceeding $ 10,000,000.

92.    Plaintiff is further entitled to recover from defendants the gains, profits and advantages they have obtained as a result of their acts of copyright infringement. Plaintiff is at present unable to ascertain the full extent of the gains, profits and advantages defendants have obtained by reason of their acts of copyright infringement, but plaintiff is informed and believes, and on the basis of such information and belief alleges, that defendants has obtained such gains, profits and advantages in an amount exceeding $10,000,000.

### SECOND CLAIM FOR RELIEF

93.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

94.    As a result of the foregoing, defendants have thereby been engaging in unfair trade practices against plaintiff to plaintiff's irreparable damage.

95.    Plaintiff has no adequate remedy at law.

### THIRD CLAIM FOR RELIEF

96.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

97.    Defendant Pancoast's conduct constitutes continuing breaches of the CIPNCA.

98.    As a result of defendant Pancoast's breaches of the CIPNCA, plaintiff has incurred substantial damages, including the loss of clients, and loss of reputation and goodwill.

### FOURTH CLAIM FOR RELIEF

99.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

100.    The CIPNCA constitutes a valid and enforceable contract between plaintiff and defendant Intuition.

101.    Defendant Intuition, at the time of the inception of its relationship with defendant Pancoast knew or should have known of the CIPNCA between plaintiff and defendant Pancoast, including the restrictive covenants and confidentiality provisions contained therein.

102.    Defendant Intuition, at the time of the inception of its relationship with defendant Pancoast knew or should have known that plaintiff was the sole proprietor of the copyright for the content material provided to it by defendant Pancoast. Defendant

Intuition knew or should have known that it would have been impossible for defendant create the volume of content he possessed without copyright infringement, and knowingly ignored this fact because of its strong need to improve the content of its online distance education business and to enter into the workshop business.

103.    Defendant Intuition intentionally interfered with the CIPNCA between plaintiff and defendant by employing defendant in its business of providing training, publications and other professional development services to banks and financial institutions, by facilitating defendant Pancoast's solicitation of plaintiff Globecon's clients and employees while employed by defendant Intuition, and by soliciting and accepting business from Globecon's clients, all notwithstanding its actual and/or constructive knowledge of the CIPNCA.

104.    Defendant Intuition's interference with the CIPNCA and plaintiff's prospective economic advantage resulted in breaches of the CIPNCA by defendant Pancoast and caused plaintiff to incur substantial damages, including the loss of clients, and loss of reputation and goodwill.

### FIFTH CLAIM FOR RELIEF

105.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

106.    Upon information and belief, defendants have taken sensitive, proprietary, copyrighted, and/or confidential matter belonging to plaintiff, and have utilized it for their own purposes without right or permission.

107.    Defendants' acts constitute unfair competition against plaintiff and the unlawful appropriation by defendants of plaintiff's proprietary, copyrighted, and/or confidential business information and intellectual property.

108.    Defendants' interference with plaintiff's prospective economic advantage caused plaintiff to incur substantial damages, including the loss of clients, and loss of reputation and goodwill.

109.    As a result of defendants' unfair competition, plaintiff has incurred substantial damages, including the loss of clients, and loss of reputation and goodwill.

### SIXTH CLAIM FOR RELIEF

110.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

111.    Defendants' acts constitute unfair competition against plaintiff, and the unlawful appropriation by defendants of plaintiff's proprietary, copyrighted and/or confidential business information.

112.    Section C of the Restrictive Covenants annexed to the CIPNCA entitles plaintiff to a temporary or permanent injunction to enforce the terms thereof without the necessity of proving damages, posting a bond or other security and without prejudice to any other rights or remedies available at law or in equity.

113.    This Section C also requires defendant Pancoast immediately "to disclose, account for and pay over to Globecon all actual compensation, profits, monies, and accruals derived or received by me as a result of any action or transactions constituting a breach of any of the Restrictive Covenants."

114.    This Section C also states that if "Globecon, in its sole and absolute discretion, is not satisfied as to the timeliness and/or accuracy of the disclosure, accounting and/or payment made to it, Globecon will notify [Pancoast] in writing and shall have the unfettered right to notify any and all entities to which [Pancoast] become[s] associated of the terms of this agreement, and I hereby do grant to Globecon the right to direct those entity(ies) to disclose directly to Globecon the information it needs to determine all actual compensation, profits, monies, and accruals derived or received by me as a result of any action or transactions constituting a breach of any of the Restrictive Covenants."

115.    Unless restrained and enjoined, defendants' unfair competition and misappropriation will continue, causing plaintiff to suffer further irreparable and incalculable harm.

116.    Plaintiff has no adequate remedy at law.

## SEVENTH CLAIM FOR RELIEF

117.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

118.    Section C of the Restrictive Covenants annexed to the CIPNCA also requires defendant Pancoast immediately "to disclose, account for and pay over to Globecon all actual compensation, profits, monies, and accruals derived or received by me as a result of any action or transactions constituting a breach of any of the Restrictive Covenants."

119.    Upon information and belief, defendant Pancoast received actual

compensation, profits, monies, and accruals derived or received by him as a result of actions or transactions constituting a breach of one or more of the Restrictive Covenants set forth in the CIPNCA.

120.    Upon an accounting by the defendants, there will be found due to the plaintiff from the defendants a large sum of money the amount of which is not known to the plaintiff.

121.    Heretofore and prior to the commencement of this action, plaintiff duly demanded of defendant Pancoast that he account for his acts as in connection with defendants' receipt of money resulting from the breach of the CIPNCA, and that he pay over to plaintiff all amounts due plaintiff under the aforesaid agreement, but the defendant Pancoast, having a duty to account to plaintiff, has failed and refused to do so and has never rendered an accounting for the moneys received under said agreement nor paid over to plaintiff any of such moneys due it.

122.    The plaintiff has no adequate remedy at law.

WHEREFORE, plaintiff demands judgment against defendants as follows:

1.  On the first, second and sixth claims for relief, for a preliminary and permanent injunction enjoining the defendants, and their agents, representatives, employees and anyone acting for or in concert with them or on their behalf, from:

    a.  manufacturing, reproducing, distributing, adapting, displaying, advertising, promoting, utilizing, or offering for sale and/or selling, any materials that are substantially similar to the copyrighted works, and to deliver to the Court for destruction or other reasonable disposition all such materials and means for producing same in defendant's possession or control;

b.  directly or indirectly soliciting or aiding or abetting the solicitation of any client of the plaintiff or any person, party or entity who was a client of the plaintiff during the last years of defendant Pancoast's employment with the plaintiff;

c.  directly or indirectly interfering with the plaintiff's business relationships with its clients and the plaintiff's negotiations and outstanding contracts with its clients;

d.  directly or indirectly communicating with or contacting clients of the plaintiff or any persons, parties or entities who were clients of the plaintiff during the last years of the employment of defendant Pancoast with the plaintiff;

e.  directly or indirectly divulging to any person, party or entity the names of any of the plaintiff's clients, the plaintiff's methods of client solicitation, the plaintiff's clients' needs and natures, the plaintiff's business information, documents, records, techniques, ideas, writings, forms, working methods, pricing, caliber of individual employees and other information not generally known to the public or competitors of the plaintiff, or any other proprietary or confidential business information of the plaintiff;

f.  using, in any manner, the plaintiff's client information and data and any other proprietary or confidential information obtained from the plaintiff;

g.  Directing the defendants to return to the plaintiff all of the plaintiff's proprietary and confidential business records, documents, information and data in their possession or subject to their custody or control, including, *inter*

*alia*, any client lists and copies thereof, and to remove any and all copies of such information from its records;

h. directly or indirectly referring to the plaintiff or to the relationship of defendant Pancoast with the plaintiff in connection with the solicitation of clients by the defendants; and

i. awarding the plaintiff compensatory damages and/or punitive damages including defendant's profits in an amount to be determined at the trial thereof, plus interest thereon.

2. On the first and second claims for relief, that defendants be required to pay to plaintiff such damages as plaintiff has sustained in consequence of defendants' infringement of said copyright and said unfair trade practices and unfair competition and to account for (a) all gains, profits and advantages derived by defendant by said trade practices and unfair competition and (b) all gains, profits, and advantages derived by defendant by his infringement of plaintiff's copyright or such damages as to the court shall appear proper within the provisions of the copyright statutes, but not less than TEN MILLION ($10,000,000.00) DOLLARS, together with interest thereon;

3. On the third, fourth and fifth claims for relief, awarding the plaintiff statutory, compensatory damages and/or punitive damages in an amount to be determined at the trial thereof, plus interest thereon,

4. On the sixth and seventh claims for relief, directing the defendants to account to the plaintiff for all moneys and property received by the defendants under the CIPNCA

as aforesaid and adjudging that the plaintiff have judgment against the defendant Pancoast for any sums found to be due plaintiff from said defendant;

5. Awarding plaintiff its reasonable attorney's fees and costs; and

6. Awarding the plaintiff such other and further relief as to the Court may seem just, proper and equitable, together with the costs and disbursements of this action.

Dated: White Plains, New York
      April 9, 2007

                          **ERIC J. ROTBARD, ESQ. (ER0750)**
                          Attorney for Plaintiff
                          81 Main Street, Suite 205
                          White Plains, New York 10601
                          (914) 422-2500

## JURY DEMAND

The plaintiff hereby demands a trial by jury as to all issues involved in this action.

Dated: White Plains, New York
      April 9, 2007

                          **ERIC J. ROTBARD, ESQ. (ER0750)**
                          Attorney for Plaintiff
                          81 Main Street, Suite 205
                          White Plains, New York 10601
                          (914) 422-2500