EMPLOYMENT AGREEMENT

AGREEMENT made as of February 15, 2002 by and between Starweaver Venture Partners I, llc, a Delaware limited liability company (the "Company"), with an address at 1 West 37th Street, 2nd Floor, New York, New York 10018-6221, and Patrick Pancoast residing at 50 Traps Lane, New Malden, Surrey, KT3 4SA, United Kingdom.

WITNESSETH

WHEREAS, the Company recently acquired the principal assets of Globecon Group, Ltd. ("XGGL") following the filing of a Chapter 11 bankruptcy of XGGL; the Company expects to retain the "Globecon Group" name and identity; and, the Company intends to redirect and refocus its business strategy to focus on XGGL's original core workshop and online products and services that made the firm a leader in the field of professional development for financial service executives.

WHEREAS, the Company is desirous of the Employee's employment upon the terms and conditions contained herein;

WHEREAS, the Employee is a individual skilled in the field of professional development for financial service executives, including as an instructor, a developer and manager of new products and services and an executive responsible for the supervision of others in the sales, business development, marketing and operations arena;

WHEREAS, the Employee is desirous of being employed by Company upon the terms and conditions contained herein;

NOW, THEREFORE, in consideration of the mutual premises contained herein and for other good and valuable consideration, the parties hereto hereby agree as follows:

1.  Employment and Title

The Company hereby employs the Employee and the Employee hereby accepts employment upon the terms and conditions set forth herein. The Employee shall serve in the capacity of an executive of the Company with a title of "President of European Operations."

2.  Term

The term of this Agreement shall commence on February 15, 2002 and shall terminate February 14, 2005 (the "Term"). The Employee shall remain an "at will" employee subject to the terms and conditions of this Agreement.

A-1                                          Company   Employee

3.  **Services To Be Rendered**

(a) During the term of this Agreement, the Employee shall report to the Chief Executive Officer of the Company and shall perform such duties as are determined from time to time by the CEO. The precise services of the Employee may be extended or curtailed from time to time at the direction and in the sole discretion of the Company's CEO. The Employee shall devote full time, attention and efforts to performing his duties hereunder. Employee shall use his best efforts, skill and abilities to promote the Company's interests during the Term hereof.

(b) The Employee is one of the Company's principal operating officers and will conduct and manage the Company's business in accordance with policies established by the Company from time to time.

(c) Initially, the Employee will be responsible for overseeing a division of the Company focused on Europe. The Employee will be responsible for establishing, building and managing this division's offices, operating budget, projected profit and loss statement, sales and business development staff, workshop delivery and operations needs. The Employee will also be responsible for building, developing and managing a group of instructors and analysts that will be responsible for workshops, content and other services throughout the Company, regardless of their location.

(d) The Employee shall be elected to a position on the Company's Board of Directors (or valuation committee; the "Board") and will serve subject to the approval and discretion of the Company's members and/or shareholders. The Employee's right to continue to serve on the Board shall be subject to the terms and conditions of the Company's bylaws, shareholder agreement and/or operating agreement, as applicable.

4.  **Compensation**

For the services rendered hereunder, the Company shall pay and the Employee shall accept the following compensation:

a) Base Compensation. The Employee's annual salary shall be $200,000.00, paid in equal installments according to the same schedule (expected to be bi-weekly) as other senior officers of the company (the "Base Compensation"); provided, however, during the first year of the Term of the Agreement the Employee's Base Compensation will be structured so that $150,000.00 is paid in equal installments over the year, $25,000.00 is paid on the six (6) month anniversary of this Agreement, and $25,000.00 is paid on the twelve (12) month anniversary of this Agreement. The Employee's annual salary shall be reviewed for annual increases on January 1, 2003, with raises to be at the discretion of the Company's Board of Directors. The Company and Employee intend to generate $1.5 - $2.0 million in revenues for the Employee's division during 2002.

A-2                    _/s/_   _/s/_
                       Company  Employee

b) The Employee's salary shall be payable subject to such deductions as are then required by law and such further deductions as may be agreed to by the Employee, in accordance with the Company's prevailing salary payroll practices.

c) Incentive Compensation. The Employee shall also participate in any executive compensation plan established by the Company's Board of Directors (the "Incentive Compensation") initially based upon the "Management Bonus Plan 2002," attached as Exhibit A.

d) Additional Compensation. The Company also agrees to pay to the Employee a bonus based upon the Company's ability to recover certain monies due from BNP Paribas (estimated to be $9,750.00 times 2) and KBC (estimated to be one-half of $21,000.00, or $10,500.00). The Company will use its best efforts to pay this additional compensation to the Employee as soon as it's CEO deems it is able to do so during the first year of the Term. The Employee may be entitled to other additional compensation (the "Additional Compensation") for other items under this Agreement, as well.

e) Equity. The Company intends to create an equity incentive program. Because the Company is organized as a limited liability company and because legal and accounting resources have not finally determined how an "Incentive Stock Option Plan" (the "Plan") would work in a limited liability company, this paragraph will outline the equity incentive *as if* the Company were a traditional corporation. When the limited liability company plan and structure is completed, the Company will construct, to the maximum extent permitted by law and the existing covenants with the new investors, an incentive stock option program and will, within a reasonable period of time hereafter, grant Employee an option with the following attributes:

   i. Number of Shares: Option to purchase shares in the Company equivalent to 3.0% of the Equity of the Company on a fully diluted, as converted basis as of the first date hereof.

   ii. Exercise Price: fair market value of the shares on the date of grant.

   iii. Vesting schedule: 1/36th of the shares on February 1, 2002 and the first of every month thereafter. Vesting will be accelerated if there is a Change of Control[1] <u>and</u> Employee is terminated without cause or quits for "Good Reason"[2]) after such Change of Control; provided, however, upon a Change of Control (regardless of the

---

[1] To be defined as any subsequent sale of equity constituting 50.1% of the voting power of the company, merger of the company with or into another company where the existing shareholders have less than 50.1% of the voting power of the surviving company, sale of all or substantially all of the assets of the company, but not including any of the above-referenced transactions in a bankruptcy or similar reorganization.

[2] Defined as reduction in Base Compensation or the requirement to relocate beyond 50 miles from London, England but does not include loss of title or change in responsibilities.

A-3                                                        Company   Employee

continuation or termination of the Employee with the surviving company), the Employee will immediately vest fifty percent (50%) of the un-vested portion of equity then due to him.

    iv. Term: The option will be for 10 years or the maximum period permitted by law, whichever is less. The exercise period will extend during employment and for 90 days after the termination of the employment relationship, subject to the Plan's terms for death, disability (longer exercise period) or termination for cause (shorter exercise period).

    v. Other: The Company's Incentive Stock Option Plans shall include terms and conditions commonly included in such plans: e.g., cashless exercise and protection during stock splits.

5.    <u>Benefits and Expenses</u>

(a)    The Employee shall participate in all fringe benefits such as medical, dental, disability, hospital and health insurance plans, profit sharing, pension and option plans, and other plans, if any, which the Company may generally make available to its executive employees. To the extent the Company is unable to secure comparable benefits for other senior officers otherwise resident in the United States, the Company may be able to satisfy its obligation hereunder by paying to the Employee the cash cost of such benefits as Additional Compensation.

(b)    During the Term of this Agreement, the Company shall, upon presentation of proper vouchers, reimburse the Employee for all reasonable expenses incurred by him directly in connection with his performance of services as an officer and employee of the Company.

(c)    The Employee shall be entitled to such vacation as permitted in accordance with any policy established by the Company's Board of Directors from time to time, but in no event shall Employee be entitled to less than four (4) weeks vacation per year, as long as this time is coordinated with the Company.

(d)    The Employee shall receive as paid days off all national holidays that the Company, pursuant to established policy, recognizes and observes.

6.    <u>Disability and Death</u>

(a)    In the event of the permanent disability of Employee, as hereinafter defined, the Company shall have the right thereafter to terminate this Agreement with Employee by sending written notice of such termination to Employee, and thereupon this Agreement shall terminate. For purposes hereof, "permanent disability" shall mean the

inability of Employee to perform his duties hereunder due to physical or mental illness, including drug abuse and alcoholism, for three (3) consecutive months or for six (6) months in any twelve (12) month period. In addition, the "permanent disability" of Employee shall also have been deemed to have occurred if the Employee shall have had appointed a guardian or conservator for him or such appointment shall have been made by a court of competent jurisdiction.

        (b)    The parties hereto hereby agree that if a disagreement arises as to whether a condition of disability exists hereunder, Employee shall submit to a physical examination by a physician of his own choice and by a physician of the Company's choice. If either physician so chosen does not agree as to the determination of disability, the two physicians shall mutually select a third qualified physician, whose determination shall be conclusive upon all parties. Each party shall bear the expense of the physician selected by such party and the expense of the third physician shall be borne equally by Employee and the Company. Employee hereby consents to the examination provided for herein and waives, if applicable, any privilege that exists between any physician and Employee as a result of such examination.

        (c)    This Agreement shall also terminate upon the date of death of the Employee at any time during the Term of this Agreement.

        (d)    Notwithstanding anything contained herein to the contrary, Employee shall be compensated as set forth in this Agreement through the date of termination of this Agreement due to permanent disability or death.

    7.    <u>Covenants and Restrictions</u>

The covenants and restrictions set forth in the Confidentiality, Intellectual Property and Non-Circumvention Agreement by and between the Company and the Employee dated February 15, 2002 are incorporated by reference herein, a copy of which is attached hereto as Exhibit B.

    8.    <u>Proprietary Property</u>

        (a)    The parties hereto hereby agree that Proprietary Property, as hereinafter defined, shall be the sole and exclusive property of the Company, except as provided below. For purposes hereof, Proprietary Property shall mean inventions, discoveries, improvements, ideas, trade secrets and know how, whether patentable or not, made solely by Employee or jointly with others, which relate to the Company's business, including any of its products, services, processes, technology, research, product development, marketing programs, manufacturing operations, or engineering activities.

A-5          _____  _____
                      Company Employee

(b) Employee shall promptly disclose to the Company in writing all Proprietary Property, including those in the formative stages, created during the Term hereof, irrespective of whether created during normal business hours. In addition, Employee hereby agrees to promptly disclose to the Company all Proprietary Property created subsequent to the date of termination hereof, irrespective of the reasons for termination hereof, which relate to or constitute an improvement on Proprietary Property or Confidential Information, as defined herein.

(c) Employee hereby agrees and acknowledges that Employee shall have no right, title or interest in or with respect to any Proprietary Property, except as described below, and will during the Term hereof or at any time subsequent to the termination hereof, at the Company's request and expense, execute any and all patent applications and assignments to the Company and take any all action as required by the Company to perfect and maintain the Company's rights and interests in and with respect to the Proprietary Property.

(d) Employee hereby agrees to maintain written records concerning the Proprietary Property and agrees to make those records available to the Company at all times.

(e) Notwithstanding anything contained herein to the contrary, Proprietary Property shall not include inventions or discoveries with respect to which all of the following conditions apply:

(i) No equipment, supplies, facilities or Confidential Information of the Company was used in its development;

(ii) It was developed on the Employee's own time;

(iii) It does not relate to the Company's business and/or any proposed or planned products or services of the Company, including any research and development activities; and

(iv) It does not arise in connection with any work performed by the Employee for the Company.

(f) During or subsequent to the Employee's employment by Company, Employee will not, directly or indirectly, lecture upon, publish articles concerning, use, disseminate, disclose, sell or offer for sale any Proprietary Property without the Company's prior written permission.

9. **Prior Agreements**

A-6                                 Company   Employee

Employee represents that he is not now under any written agreement, nor has he previously, at any time, entered into any written agreement with any person, firm or corporation, which would or could in any manner preclude or prevent him entering into this Agreement and abiding by the terms and conditions hereof.

10.  Termination Provisions

In addition to, and not in lieu of, the termination provisions set forth in Section 6 hereof, this Agreement is terminable by either party at any time for any reason, or no reason at all, subject to the following consequences:

   a.  The Employee voluntarily quits. In the event that the Employee voluntarily resigns from the Company, any and all vesting of compensation under Section 4 (a), (b), (c), (d) and (e) will stop, and the Company **shall not** be obligated to make any further payments hereunder to the Employee, including any unvested compensation described in Section 4 (a), (b), (c), (d) and (e).

   b.  The Employee is terminated "For Cause." "For Cause" termination may occur if the Employee (i) breaches this Agreement, (ii) violates any fiduciary duty or engages in any act of dishonesty with respect to the Company, including any negligent act that causes material financial or reputational harm to the Company, or (iii) is convicted or pleas nolo contendere to a felony or any crime involving theft, fraud or dishonesty. In case of a "For Cause" termination, the Employee may be terminated effective immediately upon delivery of written notice setting forth the reason or reasons for such termination and the Company **shall not** be obligated to make any further payments hereunder to the Employee, including any unvested compensation described in Section 4 (a), (b), (c), (d) and (e). Any and all options not otherwise exercised by the Employee maybe immediately extinguished without additional compensation to the Employee, and the Company will have a one-year right to repurchase any and all shares then held by Employee at the same price the Employee paid for those shares originally.

11.  Miscellaneous

   (a)  This Agreement shall inure to the benefit of and be binding upon the Company, its successors and assigns, and upon the Employee, his heirs, executors, administrators, legatees and legal representatives.

   (b)  Should any part of this Agreement, for any reason whatsoever, be declared invalid, illegal, or incapable of being enforced in whole or in part, such decision shall not affect the validity of any remaining portion, which remaining portion shall remain in full force and effect as if this Agreement had been executed with the invalid portion thereof eliminated, and it is hereby declared the intention of the parties hereto that they

A-7                                       Company    Employee

would have executed the remaining portion of this Agreement without including therein any portion which may for any reason be declared invalid.

    (c)    This Agreement shall be construed and enforced in accordance with the laws of the State of New York applicable to agreements made and to be performed in such State without application of the principles of conflicts of laws of such State.

    (d)    This Agreement and all rights and obligations hereunder are personal to the Employee and shall not be assignable or delegable, and any purported assignment or delegation in violation hereof shall be null and void. Any person, firm or corporation succeeding to the business of the Company by merger, consolidation, purchase of assets or otherwise, shall assume by contract or operation of law the obligations of the Company hereunder; provided, however, that the Company shall, notwithstanding such assumption and/or assignment, remain liable and responsible for the fulfillment of the terms and conditions of the Agreement on the part of the Company.

    (e)    This Agreement constitutes the entire agreement between the parties hereto with respect to the terms and conditions of the Employee's employment by the Company, and this Agreement supersedes and renders null and void any and all other prior oral or written agreements, understandings, or commitments pertaining to the Employee's employment by the Company. This Agreement may only be amended upon the written consent of both parties hereto.

    (f)    Disputes, if any, will be resolved through binding arbitration by a panel of three arbitrators provided by the American Arbitration Association in New York with the losing party being responsible for the legal fees and expenses of the prevailing party. Any party that appeals the award of the panel, if any, to the extent the appeal is not successful will be responsible for payment of any and all legal costs and fees borne by the other party as a result, plus interest on the award, fees and costs at a rate of 15% from first date of award.

    (g)    Any notice required or permitted to be given under this Agreement shall be in writing and shall be delivered in person, by nationally recognized courier service or by certified mail, return receipt requested, postage prepaid, to the parties at the addresses set forth above, or at such other place that either party may designate by notice in the foregoing manner to the other. If mailed as aforesaid, any such notice shall be deemed given on receipt or three (3) days after being so mailed, unless the receiving party proves the notice was received later or not received.

    (h)    The failure of either party to insist upon the strict performance of any of the terms, conditions and provisions of this Agreement shall not be construed as a waiver or relinquishment of future compliance therewith, and said terms, conditions and provisions shall remain in full force and effect. No waiver of any term or any condition of

this Agreement on the part of either party shall be effective for any purpose whatsoever unless such waiver is in writing and signed by such party.

    (i)    The provisions of Sections 7, 8, 10 and 11 of this Agreement shall survive any termination of this Agreement.

    (j)    The headings in this Agreement are inserted for convenience and shall not affect any interpretation of this Agreement.

    IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first written above.

STARWEAVER VENTURE PARTNERS I, LLC    FOR HIMSELF, INDIVIDUALLY

By: _____    By: _____
Paul Siegel, Managing Partner    Patrick Pancoast

A-9

Company    Employee

# EXHIBIT A
## MANAGEMENT BONUS PLAN 2002

**Period Covered**          Calendar 2002

**Bonus Calculation**       Bonus Percent from the following table multiplied by the recipient's base salary at 12/31/02

**Gross Profit[3] Plan 2002**  As per the final 2002 budget approved by Board on or before April 1, 2002.

**Percent of Rev. Plan**    Calculated by dividing the actual Gross Profit from all sources for calendar 2002, by the Gross Profit Plan 2002.

**Bonus Percent**           Calculated as follows, where $X = 33.33\%$

| Percent of Gross Profit Plan | 75% | 90% | 100% | 125% | 150% |
|---|---|---|---|---|---|
| Bonus Percent (% of base salary) | 0% | 0.3X% | X% | 1.5X% | 2.5X% |

### Other Terms, Conditions and Notes:

- Linear interpolation will be used if the results fall between two specific values: For example, if FY 02 revenue results show actual revenues = 95% of the revenue plan, then the Bonus Percent will equal 0.65X% of salary.

- The bonus is not vested or subject to proration until 12/31/02, and the recipient of a bonus must be in the employ of the Company and in good standing on December 31, 2002 in order to be eligible for a bonus.

- Bonus payments in excess of $50,000 may, in the discretion of the Board, be issued in the form of stock, in an amount and at a fair market value to be determined at that time in the sole discretion of the Board. Otherwise, payments will be made in cash and applicable taxes will be withheld.

- Amounts will be paid on or before March 15, 2003.

---

[3] "Gross Profits" are calculated as gross income actually received by the company (i.e., gross sales less bad debts, charge-offs) less the cost of goods sold ("COGS"), calculated per generally accepted accounting principles applied on a consistent basis between planned Gross Profits and actual Gross Profits.

A-10                                                Company    Employee

**EXHIBIT B**

A-11                    ____    ____
                        Company Employee

**EXHIBIT B**